# EXHIBIT 1

**PUBLIC CITIZEN LITIGATION GROUP**
1600 20th Street NW • Washington DC 20009
202/588-1000 • www.citizen.org

August 22, 2018

Daniel P. Schaefer
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

RE:   *Public Citizen v. Department of Education*, No. 18-691 (TNM)

Dear Dan:

I appreciated the opportunity to speak with you and Department of Education (ED) representatives regarding the agency's search for responsive records in the above-captioned case. As you will recall, I indicated during our conversation that we had concerns about the scope of the agency's search, including whether the agency should have searched additional offices and FedLoan for responsive records. However, we agreed to wait for further discussion until we reviewed additional disclosures that ED was preparing at that time.

Although I believe that there will likely be some additional records disclosed in response to processing issues I identified last week, I have reviewed the documents that ED has provided thus far. Unfortunately, we still have concerns about the adequacy of the search and some of the redactions that have been made. I am writing with the hope that we could resolve these concerns— or at least narrow them substantially—without further litigation. Please note that we do not waive any later right to contest the adequacy of ED's search in any respect or to challenge its withholding, in full or in part, of any records.

**ADEQUACY OF THE SEARCH**

We addressed in our administrative appeal the fact that many responsive records appeared to exist but had not been disclosed. Our appeal noted, for example, that ED had not provided any documentation of its dispute process for conversions or findings from an audit of 36,000 conversions made by ACS and FedLoan, even though it assured GAO that it would undertake this audit. We also indicated that ED had not disclosed records regarding "Phase II" of its process to fix erroneous ACS conversions, even though records released by that time indicated that Phase II records existed. We remain concerned that ED's disclosures thus far do not fill in these gaps. We do not have a full description of the dispute process, the audit findings for a universe of 36,000 conversions, or the change request form and supporting documentation regarding Phase II.

Moreover, the attached chart identifies a number of specific documents described in the newly released records. Based on the descriptions of these documents contained in the released records, we believe these documents are responsive to our FOIA request but have not yet been produced. Courts have been clear that agencies have a "duty to follow-up on any known leads," including by revising a search "'to account for leads that emerge during [their] inquiry.'" *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 73–74 (D.D.C. 2017) (quoting *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998)).

The chart also documents instances in which the released records specifically refer to involvement by the Office of the General Counsel, the Office of the Undersecretary, the Office of Postsecondary Education, and Federal Student Aid's Policy Liaison & Implementation in TEACH grant-to-loan conversions. Based on our previous conversation, it is my understanding that neither these entities nor FedLoan were included in ED's previous searches. Based on the number of responsive documents that appear to exist but that have not been disclosed, and the strong indication that these ED entities and FedLoan may have responsive records, we would like for ED to include them in an additional search if it has not already.

**REDACTIONS**

As I noted in an earlier conversation with you, we have not received a final determination letter identifying the FOIA exemptions on which ED relies for redactions and the extent, if any, of ED's withholding of entire documents or pages of records. I would ask that your client provide us with such a letter.

Of those withholdings that are apparent to us, there are two categories of redactions of particular concern. First, ED has redacted pursuant to FOIA Exemption 6 various months and days listed in a series of quarterly review reports. These reports, which appear frequently in the 71-page document but which also are included in the 1302-page document, memorialize audits that ED conducted of its servicers' handling of individual TEACH Grant recipients' accounts, including their handling of disputes filed by recipients with respect to grant-to-loan conversions. We do not object to the withholding of recipients' names, but we believe that without those names, the months and days relevant to account activities are not covered by Exemption 6. Even if some privacy interest were implicated, the public interest in disclosure of these dates is high: They demonstrate when ED's servicers took steps with respect to recipients' accounts and will help the public piece together how much of the grant-to-loan conversion problems can be attributed to servicer error.

In addition, ED redacted from a document titled "TEACH GRANT CLEAN UP PROJECT WORK PLAN" (at PDF 88-92 of the 1302-page document) various information pursuant to FOIA Exemption 5. As I indicated in my email of August 16, 2018, this same document has been produced elsewhere in the responsive records without redactions, so we would like clarification from ED as to its position on the disclosure of this information. We do not think the redacted information, which appears to memorialize what ED and its servicers did and did not do to correct erroneous conversions, is the type of information appropriately covered by Exemption 5.

\* \* \*

Once you have had an opportunity to review this letter and the relevant records, I would welcome the opportunity to speak with you about next steps.

                                      Sincerely,

                                      */s/ Julie Murray*

                                      Julie Murray
                                      Counsel for Public Citizen, Inc.

## Volume I
**(1302-page document)**

| Page | Description Noted in Documents | Issue |
|---|---|---|
| PDF 1, 4, 10 | Document refers to previous "2/15/18 response" and 1/3/2018 correspondence from ED to GAO regarding the GAO's review of the TEACH Grant program, including erroneous conversions. | Although we have received some ED/GAO correspondence, we have not received the 1/3 or 2/15 ED responses. |
| PDF 2, 75 | Documents refer to Change Request (CR) 3188, which appears to have formalized a process to avoid erroneous conversions of TEACH grants to loans for certain recipients who remained enrolled in school. | Although we have received FedLoan's "Impact Analysis" for CR 3188 (*see* PDF 75), we do not appear to have the Change Request itself. |
| PDF 2-3 | Document states that PHEAA "offers schools upon request a custom report to help in monitoring their TEACH portfolio. This has been considered valuable data in reporting grant-to-loan conversion rates specific to TEACH Grant recipients from their institution." | We have not received any of these institution-level reports, which are findings by FedLoan with respect to recipients whose grants were converted to loans. |
| PDF 6-9 | Document includes (at PDF 8-9) a request from GAO to ED to clarify the extent to which "clean-up operations" addressed specified errors contributing to 2,252 erroneous conversions identified in the GAO report, and identifies four such reasons, including that "the recipient [was] not given 30 days from final certification to certify." ED responded (at PDF 6) that "[t]o its knowledge, the scope of the clean-up project that FSA managed did not address the specific conditions outlined in the response GAO received from FedLoan. If this was a population identified by FedLoan – recommend that GAO clarify with FedLoan if this was an additional population or included as part of the multiple phase clean-up effort as outlined in the previous responses." | This document indicates that FedLoan may have additional findings with respect to grants converted to loans in error that have not yet been produced and that should be requested of FedLoan. |
| PDF 4 | Document refers to unspecified "forms" requested by GAO that were "pending OGC review." ED stated that it would send those forms "once they ha[d] been cleared and [were] finalized." | It is unclear based on the description whether these forms should have been released in |

1

|  |  |  | response to the FOIA request. Could you clarify what these forms are? Also, this description provides support for searching ED's Office of General Counsel to determine whether it has responsive records. |
|---|---|---|---|
|  | PDF 87 | Document refers to "three CR's" or Changes Requests: "Phase I and Phase II and Phase III." It indicates that Phase II corresponds to Change Request 2963, which was updated at least once for cost purposes. This document also indicates that FedLoan did an "Impact Analysis" for Phase II that appears to have been complete in early 2015. | We have not ever received a copy of the Change Request (CR) for Phase II, which we believe is CR 2963. We identified this document in our administrative appeal as one of the missing records. |
|  | PDF 88 | Document indicates that FedLoan was charged with evaluating NSLDS data "for potential conversions in error," and that after conducting "QA on suspected population," FedLoan was supposed to (1) send to ED "final population count information," (2) "[e]valuate/compare populations against disputes and incoming disputes," and (3) "[p]rovide risk lists/categorization to FSA for 'risk' populations (PIF, etc.) where final status occurred @ ACS." | We have not received all of these documents demonstrating FedLoan findings post-QA. (It is unclear whether PDF pp. 1025-26 of the pre-litigation disclosures we obtained is based on pre- or post-QA analysis by FedLoan.) |
|  | PDF 89 | Document indicates that ED "included OPE and OUS in the approval process" for a communications plan to fix grants erroneously converted to loans by ACS. | This document provides further support for searching the Office of Postsecondary Education and the Office of the Under Secretary to determine whether they have responsive records. |
|  | PDF 89 | Document indicates that there was a plan for FSA's Policy Liaison & Implementation (PLI) to give FedLoan "written guidance" for correcting TEACH Grants incorrectly converted to loans. It states that OGC and OPE would be involved. It also states that "scenarios" of erroneous conversions would be "identified" and that "[d]ecisions" would be made "on what items will be handled by FSA on a case by case basis." | We have not received the "written guidance" described here or documents describing which conversion cases would be handled by FSA versus FedLoan. Our administrative appeal specifically addressed the fact that ED had not disclosed these types of standards/guidance on the dispute process. |

|  |  |  | Also, could you confirm whether there are any documents regarding "scenarios" of erroneous conversions beyond Change Request 3002, which was produced to us in a pre-litigation disclosure? |
|---|---|---|---|
| PDF 90 | | Document states that FedLoan would "identify active and inactive TEACH Loans that were/at DMCS that had improper [*word(s) missing due to cell size*]" and "provide list and number of incorrectly converted TEACH grants to Dwight/[Private Collection Agencies]. It states that further action was not taken because "no change in collection efforts [was] needed." | We have not received findings with respect to those TEACH Grant recipients affected by erroneous conversions and subject to involuntary collections. Nor have we received any documents that demonstrate why there would be no change in collection efforts for affected recipients. |
| PDF 1210-11 | | Document states that "FedLoan and FSA have reviewed 3,246 disputes" of grant-to-loan conversions and that "2,268 were approved for reconversion." It also states that FedLoan conducted a "manual review" that "uncovered grants which were incorrectly converted to loans outside the established program timeframes." | We have not received any records regarding the findings for this subset of recipients. |
| PDF 1211 | | Document appears to be an ED response to questions arising from the GAO audit of the TEACH Grant program. It provides a description of the process for FedLoan and ED to review disputes of conversions. It states that FSA "only considered reconversion of loans back to grants due to servicing errors and we have specifically identified those servicing errors. FSA has granted FedLoan authority to review and determine the approval or denial of these specific conversions without additional FSA review." It goes on to note that "[i]mplementation of this change provided for quicker resolution of disputes (one review instead of two) to benefit recipients. FedLoan refers any questionable dispute to FSA for careful review, including those that escalated, or were received through Ombudsman or Control Mail." | We have not received any records that show how authority was divided between FSA and FedLoan to resolve disputes of grant-to-loan conversions, yet this description indicates that there was such a division of labor and that rules existed for when disputes would be elevated to FSA and when FedLoan would resolve them directly. |

3

| PDF 1211 | Document includes a request from GAO asking whether ED "track[s] and evaluate[s] the number and reasons for reconversions" of TEACH Grants. ED states that "[d]isputes trends are tracked on weekly monitoring reports which are reviewed by FSA with FedLoan" and that if "a new trend is discovered we analyze to find the root cause and review with FedLoan." It provided as an example "a spike in the number of conversions or certifications received." | We have not received any of these weekly monitoring trend reports as they apply to disputes of conversions and reconversions of TEACH Grants. |
|---|---|---|
| PDF 1212 | Document indicates that there were two attachments memorializing a monitoring report from the 3rd quarter of FY 2013. | It appears that we only received one of these two documents. |
| PDF 1214 | Document indicates that ED "provided [to GAO] documentation of its grant conversions appeal process." | We did not receive this documentation. |
| PDF 1247 | Document identifies certain requirements for FedLoan with respect to the TEACH Grant program and states that once "a TEACH Grant is converted to a Direct Unsubsidized Loan (TEACH), it cannot be converted back to a grant unless it is an exception granted by FSA." | We do not have any documentation of "exception[s] granted by FSA" or how the exception process works, despite this indication that there is an exception process for reconversions. |
| PDF 1269 | Document refers to an "FSA Tracking Log" that documents "system issue[s]," including—as described here—an issue regarding an improper grant-to-loan conversion. | We have some documentation of conversion-related issues flagged in this Log (see Volume II, PDF 32-33), but that documentation is dated in 2015. Could you please confirm whether any additional entries in the Tracking Log identify findings related to TEACH conversions or processes/standards for identifying erroneous conversions or initiating reconversions? |
| PDF 1270 | Document indicates that PHEAA was not giving TEACH recipients sufficient time to respond to certification reminders. It charges PHEAA with "identify[ing] recipients with like issue accounts" and supplying | Although we received PHEAA's corrective action plans for a number of other conversion issues, we did not receive this one. |

| | FSA "with a corrective action plan in writing by May 1, 2014, to prevent future errors of this type." | |
|---|---|---|
| PDF 1294 | Document again refers to Change Request 2963 and various communications made to recipients whose grants were erroneously converted by ACS. It states that "PHEAA performed the necessary steps to redistribute or refund applicable payments, corrected credit report, reinstated each grant record and write off [sic] the appropriate TEACH Loans." It also states that for "borrower serviced elsewhere or with inactive TEACH Loans where suspected errors are identified, PHEAA provided FSA a listing of scenarios, borrowers and suspected errors to consider." | We have not received CR 2963 and do not believe we have copies of the communications developed pursuant to it. We also have not received the other findings referred to in this section for borrowers who were serviced elsewhere or had inactive TEACH Loans. |

**Volume II\***
**(71-page document)**

| Page | Description Noted in Documents | Issue |
|---|---|---|
| PDF 3 | Document includes a corrective action plan from PHEAA stating that "PHEAA was provided guidance to account for weekends and holidays on initiating conversion." | We have not received copies of this guidance demonstrating how PHEAA was to determine whether conversion was appropriate. |
| PDF 32 | Documents addresses a provision of the ED/PHEAA contract that required FedLoan to convert TEACH grants to loans if a recipient was still in school, did not take out a new TEACH Grant, and did not submit a recertification form. It states that "FedLoan requested a waiver to avoid unnecessary conversions from grants to loans," and that "FSA provided [that] waiver." | We do not have a copy of the waiver referred to here. |

| PDF 21, 33 | Document at PDF 21 indicates that PHEAA prepares some grant conversion disputes "as an escalated issue for the San Francisco team to review." Document at PDF 33 indicates the San Francisco team is part of FSA at ED. | We have not received any documents regarding this tiered review process for adjudicating TEACH Grant conversion disputes. |
|---|---|---|
| PDF 33 | Document indicates that "FSA approved accepting . . . additional conversion requests" received by FedLoan after the deadline as part of the "CR2863 TEACH Grant Cleanup." | We do not have a copy of this approval. |
| PDF 35 | Document refers to a follow-up question from PHEAA regarding "Q&A 40 from the Q&A tab on the TEACH Requirements spreadsheet." It appears that PHEAA used these Q&As as guidance for how to deal with various scenarios that arose in overseeing TEACH grants. | We do not have copies of these Q&As, which would be responsive if they deal with the propriety of converting grants to loans or the dispute process for conversions. |
| PDF 64 | Document states that FSA reviewed "FedLoan Servicing's dispute procedures" and that FedLoan "has a thorough process for documenting and tracking TEACH Grant disputes." It states that the "review team did identify an area in which FSA may be able to add efficiency to the dispute process by revising the designated authorities found in CR 2486." | We do not have a copy of CR 2486, which appears to deal with the conversion dispute process. |

\* Note that our review of this document has been limited in part by the processing issues, including missing pages, identified in my correspondence of August 16, 2018.

6